AO 91 (Rev. 11/11) Criminal Complaint

FILED by _____ D.C.

JUL 22 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

Case No. 15-8398-DLB

United States of America
v.
Daniel Fernandes Rojo Filho,
a/k/a Daniel Fernandes Filho,
a/k/a Daniel Fernandes,
a/k/a Daniel Rojo

Case No. 15 MJ 7163 JCB

Defendant(s)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __June 2014 through the present__ in the county of __Suffolk and elsewhere__ in the
District of __Massachusetts__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:
See Affidavit, attached.

☑ Continued on the attached sheet.

_____ SA FBI
Complainant's signature

Brian O'Hara, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: June 25, 2015

_____
Judge's signature

City and state: Boston, MA

Jennifer C. Boal, Chief U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT OF BRIAN O'HARA

I, Brian O'Hara, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2010. My responsibilities include the investigation of federal offenses including, but not limited to, wire fraud, mail fraud, securities fraud, and other economic crimes. My education, training, and experience has focused on finance, accounting, business practices, and economics.

2. I am aware that Title 18 of the United States Code, Section 1343, makes it a crime for anyone who has devised or intended to devise a scheme or artifice to defraud, or obtained money or property by means of false or fraudulent pretenses, representations, or promises to transmit or cause to transmit by means of wire, radio, or television communications in interstate commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. Having so said, I make this affidavit in support of a criminal complaint charging Daniel Fernandes Rojo Filho, a/k/a Daniel Fernandes Filho, a/k/a Daniel Fernandes, a/k/a Daniel Rojo ("**FILHO**"), age 47, of Orlando, Florida with wire fraud, in violation of Title 18, United States Code, Section 1343.

3. The facts stated herein are based on my own personal involvement with this investigation, as well as my review of documents and information provided by others assisting in this investigation and by witnesses. In submitting this affidavit, I have not included each and every fact known to me about this investigation. Rather, I have only submitted those facts which I believe are sufficient to establish probable cause.

## BACKGROUND

4. **FILHO** is a citizen of Brazil and a resident of Orlando, Florida.

5. DFRF Enterprises LLC ("DFRF") is a private, limited liability company incorporated both in Florida and in Massachusetts. DFRF's filings with the Florida Department of State list **FILHO** as the managing member of DFRF (which letters are also **FILHO**'s initials). DFRF's filings with the Massachusetts Secretary of State also list **FILHO** as the manager of DFRF. **FILHO** signed an operating agreement concerning DFRF, dated October 6, 2014, which identifies him as a managing member of DFRF.[1]

6. Since 2014, DFRF has opened at least 19 bank accounts at different financial institutions. **FILHO** is a signatory on 17 of the 19 DFRF bank accounts that have been identified.

7. Earlier this year, I began investigating complaints by various individuals alleging that **FILHO** had potentially misappropriated money that they had given him to invest in DFRF.

## SCHEME TO DEFRAUD

8. As set forth below, beginning in or about June 2014, and continuing through in or about the present, **FILHO** fraudulently obtained money and property by offering individuals the chance to invest money in DFRF. Among other things, **FILHO** and others acting at his direction falsely represented that DFRF owned and operated gold mines in Africa and South America, that any investors' money was 100% insured, and investors could withdraw their principal

---

[1] On a "Certificate of Membership" that one individual received after paying to invest in DFRF in reliance on the representations of **FILHO** and others working at his direction, **FILHO** is identified as the "President" of DFRF.

- 2 -

investments at any time. **FILHO** never invested the money as promised; instead, **FILHO** used the money for other purposes, including his own personal and other business expenses.

## MANNER AND MEANS OF THE FRAUD

9. It was part of the fraudulent scheme that **FILHO** and others working at his direction offered individuals an opportunity to invest in or become "members" of DFRF, which required them to give **FILHO**/DFRF money. The pitch that **FILHO** and others working at his direction gave to investors—both in person in Massachusetts, Florida, and elsewhere, and via videos posted on the internet—was, in sum and substance, as follows:

   a. **FILHO** and others working at his direction claimed that DFRF owned land in Brazil—or had the rights to mine such land—that contained significant amounts of gold. **FILHO** and others working at his direction claimed that a Brazilian company called Geosol had verified the value of the gold deposits in DFRF's land.

   b. **FILHO** and others working at his direction claimed that, based on the value of the gold in the land in Brazil, DFRF obtained a "line of credit," which it in turn used to invest in ongoing, highly profitable gold-mining operations in Africa.

   c. **FILHO** and others working at his direction offered individuals the chance to share in the "profits" DFRF was generating. They told potential investors that, by sending DFRF as little as $1,000, or as much as an individual wanted to invest, an individual could become a "member" of DFRF.

d. **FILHO** and others working at his direction represented that the "members'" money would then be sent to a particular private bank—Platinum Swiss Trust ("PST")—in Switzerland, where the money would be "leveraged three times".[2] After the money was "leveraged" by PST, it would then be invested in the African mining operation, where "members'" "profits" would allegedly increase even more.

e. **FILHO** and others working at his direction represented that DFRF "members" would receive a profit or "interest" payment of approximately 15% per month.

f. **FILHO** and others working at his direction also represented that "members'" investments would be 100% insured by an insurance company called Accedium, incorporated in the United Kingdom and Barbados.

g. **FILHO** and others working at his direction represented that "members" could get their principal investment returned anytime they wanted and, accordingly, **FILHO** and DFRF routinely issued checks to "members" in the amount of their principal investments after the individuals made those payments to DFRF.

---

[2] **FILHO** generally did not explain how the money would be "leveraged" or otherwise increased by PST.

- 4 -

10. Many of these representations were false and misleading in numerous ways, including, among other things:

   a. Geosol, the company in Brazil that **FILHO** and others working at his direction said had verified the value of DFRF's gold deposits in Brazil, never did any such thing. In fact, Geosol posted a notice on its corporate website warning that it has never provided services to DFRF Enterprises.

   b. DFRF has never sent any "member" money (or money of any kind) to PST in Switzerland. Moreover, PST—according to Swiss authorities—is not authorized to conduct banking activities in Switzerland. A person identified herein as Co-Conspirator 1 ("CC-1") is the person listed on the PST's registration information filed with the Swiss government, and he also represented himself to be the president and director of PST in some of the DFRF promotional videos posted on the internet. However, CC-1 is actually **FILHO's** partner in DFRF, as evidenced by the following:

      i. CC-1 is listed as the only other managing member who signed the DFRF operating agreement, dated October 6, 2014;

      ii. CC-1 is a signatory on multiple DFRF bank accounts; and

      iii. An analysis of DFRF's bank accounts show payments totaling over $600,000 made to CC-1 himself.

   c. Bank records reviewed to date indicate that no money has been paid to any entity by the name of Accedium, the company that allegedly insured investments in DFRF. In a December 8, 2014 DFRF video, which was posted

- 5 -

on the internet, an individual identified herein as Co-Conspirator 2 ("CC-2") was identified as an "insurance executive," and described as "the person responsible for the insurance company." In a subsequent DFRF video, posted on the internet on December 10, 2014, **FILHO** represented that DFRF obtained its Accedium insurance through CC-2. CC-2's license to sell insurance, however, was revoked in 1996.

d. The checks that **FILHO** and others working at his direction caused to be written in the amounts of the "members'" initial, principal "investments" were drawn on accounts with insufficient funds and/or accounts that had been closed. As a result, the investors were unable to cash their respective checks.

11. It was also part of the fraudulent scheme that **FILHO** willfully ignored that the "members" who were giving DFRF money in reliance on **FILHO's** representations were not qualified under securities laws and regulations to make such investments in private companies. Those laws and regulations generally require such individuals to have a net worth in excess of $1 million or earn more than $200,000 per year in income. At least two individuals who eventually paid money to "invest" in DFRF discussed this matter with **FILHO** prior to investing. One investor told **FILHO** that none of the investors appeared to be qualified. Another investor told **FILHO** that she, herself, did not meet the qualification outlined in the DFRF Private Placement Memorandum. **FILHO** told that investor in response that he would accept whatever amount of money she was able to invest.

12. It was also part of the fraudulent scheme that **FILHO** recycled some of the money received from "members"—which accounted for nearly all of the money in DFRF's accounts—

to pay to certain "members" what **FILHO** and others working at his direction represented to be "interest" payments from DFRF's mining operations.

## ACTS TAKEN IN FURTHERANCE OF THE SCHEME

13. On or about October 6, 2014, **FILHO** signed an operating agreement, which purported to set forth the operations of DFRF and which named **FILHO** as a managing member.

14. On or about October 3, 2014, **FILHO** opened an account in the name of DFRF at Eastern Bank, which account lists **FILHO** and CC-1 as the two "Managers" of DFRF. Subsequently, **FILHO** opened various other bank accounts in the name of DFRF, including other accounts in Massachusetts and Florida.

15. On or about October 16, 2014, after traveling from Florida to Boston, **FILHO** pitched the DFRF scheme to people whom he and others working at his direction had invited to attend a meeting aboard a for-hire vessel in Boston Harbor. This was one of several trips **FILHO** took to Massachusetts between June and November 2014 to pitch the DFRF scheme to potential investors.

16. In or about December 2014, an individual who had invested approximately $50,000 in DFRF in reliance on the representations of **FILHO** and others working at his direction (hereinafter "Investor A"), was not receiving the payments that he/she had been promised. Investor A traveled from Massachusetts to Florida in an attempt to get some of his/her money, and met with **FILHO** in person at DFRF's office in Orlando. **FILHO** took out a checkbook, wrote Investor A a check in the amount of $10,000, and handed it to him/her. After returning to Massachusetts, Investor A subsequently tried to cash the check at a bank; however, Investor A was informed that the check was not good and would not clear.

- 7 -

17. On various dates between October, 2014 and the present, **FILHO** caused videos to be posted on the internet in which he and others working at his direction solicited individuals to pay money to become "members" of DFRF. Such videos, when uploaded and viewed, are transmitted by means of wire in interstate commerce.

18. On or about May 15, 2015, shortly before Eastern Bank closed one of DFRF's accounts because of what it believed to be suspicious activity, **FILHO** caused $1.8 million to be wired in interstate commerce from that account to a DFRF account at Citibank, which account **FILHO** also controlled.

19. An analysis of DFRF's bank accounts shows that **FILHO** and DFRF have received approximately $12,000,000 from investors since approximately June 2014. The bank account records further show that money was not transmitted to PST in Switzerland to be invested, as **FILHO** and others working at his direction had represented, nor was it invested at all. Instead, bank account records show that the money was used for other business and personal expenses.

20. **FILHO** himself has taken more than $3,500,000 of DFRF "members'" money for his own use. Specifically, **FILHO** has made many cash withdrawals, and has also spent money on travel, automobiles, swimming-pool services, various consumer goods, and restaurants. For example, a review of checks drawn on DFRF bank accounts and signed by **FILHO** show that he paid approximately $2 million to a luxury car dealership in Florida to purchase a number of luxury cars, including multiple Lamborghinis, a Ferrari, a Rolls Royce, a Tesla, a Mercedes, and two Cadillac Escalades.

## CONCLUSION

21. Based on the foregoing, I have probable cause to believe that **FILHO** devised and intended to devise a scheme and artifice to defraud, and obtained money and property by means of material false and fraudulent pretenses, representations, and promises and did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme and artifice in violation of Title 18, United States Code, Sections 1343 and 2.

I hereby certify that the foregoing is true and correct. Executed this 25 day of June, 2015.

Brian O'Hara
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me
this 25th day of June, 2015.

JENNIFER C. BOAL
UNITED STATES CHIEF MAGISTRATE JUDGE

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
District of Massachusetts

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Daniel Fernandes Rojo Filho, | ) | Case No. 15 M S 7163  JCB |
| a/k/a Daniel Fernandes Filho, | ) | |
| a/k/a Daniel Fernandes, | ) | |
| a/k/a Daniel Rojo | ) | |
| | ) | |
| *Defendant* | | |

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)* Daniel Fernandes Rojo Filho,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment ☐ Superseding Indictment ☐ Information ☐ Superseding Information ☑ Complaint
☐ Probation Violation Petition ☐ Supervised Release Violation Petition ☐ Violation Notice ☐ Order of the Court

This offense is briefly described as follows:

Wire Fraud, in violation of 18 U.S.C. § 1343.

Date: 6-25-15

_____
*Issuing officer's signature*

City and state: Boston, Massachusetts

Steve York, Deputy Clerk
*Printed name and title*

---

**Return**

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*